**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO: 25-11911** |
| | § | |
| **STRUCTURE ACE, LLC,** | § | **CHAPTER 7** |
| | § | |
| **DEBTOR.** | § | **SECTION A** |

**MEMORANDUM OPINION AND ORDER**

Before the Court are cross-motions for summary judgment:

(i) the *Motion for Summary Judgment* (the "Purchasers' MSJ"), [ECF Doc. 168], filed by Property Claim Relief, LLC ("PCR"), Insured Advocacy Group, LLC ("IAG"), and Insured Advocacy Group II, LLC ("IAG 2") (collectively, the "Purchasers"); and

(ii) the *Trustee's Motion for Summary Judgment Against Property Claim Relief, LLC* (the "Trustee's MSJ"), [ECF Doc. 169], filed by Greta M. Brouphy, the appointed Chapter 7 Trustee (the "Trustee").

Both motions are opposed. [ECF Docs. 171 & 172]. Both parties submitted statements of uncontested material facts, [ECF Docs. 168-1 & 169-1],[1] as well as reply briefs in support of their respective motions for summary judgment, [ECF Docs. 174 & 175].

Also before the Court is the Trustee's objection to PCR's proof claim (the "Claim Objection"). [ECF Doc. 121].

For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** the Purchasers' MSJ; **GRANTS IN PART** and **DENIES IN PART** the Trustee's MSJ; and **SUSTAINS IN PART** and **OVERRULES IN PART** the Claim Objection.

---

[1] The Purchasers filed a response to the Trustee's statement of uncontested material facts. [ECF Doc. 172-1]. The Trustee's opposition to the Purchasers' MSJ includes an objection to a number of statements in the Claimants' statement of facts as constituting legal conclusions and/or as unsupported. [ECF Doc. 171].

## JURISDICTION AND VENUE

This Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. § 1334. The matters presently before the Court constitute core proceedings that this Court may hear and determine on a final basis under 28 U.S.C. § 157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL HISTORY

In the aftermath of Hurricane Ida in October 2021, the Debtor contracted with a number of property owners to repair property damage caused by the storm. In connection with the repair contracts, each property owner entered into an agreement purporting to, among other things, assign its post-loss insurance benefits to the Debtor. On August 22, 2022, and May 12, 2023, the Debtor entered into master purchase agreements with IAG and PCR, respectively, to provide for the sale and assignment of the Debtor's rights under the repair contracts as well as the proceeds payable under the property owners' insurance policies. Pursuant to the master purchase agreements, the Debtor executed purchase addenda with each Purchaser evidencing the sale of specific portfolios of invoices. Each purchase addendum provides that the Purchaser has the right to disburse to itself all funds received under that portfolio until it has recovered the purchase price of the portfolio plus a factor fee, before remitting any surplus to the Debtor.

On August 28, 2025, the Debtor filed a voluntary petition for bankruptcy relief under Subchapter V of Chapter 11 of the Bankruptcy Code. [ECF Doc. 1]. Each of the Purchasers filed a proof of claim. [Claim Nos. 17–19]. On December 1, 2025, the Court entered an Order converting the case to one under Chapter 7. [ECF Doc. 61]. Greta Brouphy was appointed to serve as the Chapter 7 Trustee. [ECF Doc. 66].

The Court scheduled an evidentiary hearing on September 10, 2026, [ECF Docs. 130 & 139], to resolve several contested matters related to the respective rights of the Debtor and the Purchasers under the master purchase agreements and purchase addenda (together, the "Contested Matters"):

First, on March 25, 2026, PCR filed a motion to lift the stay to exercise its rights of recovery under claims it alleges it purchased related to work performed by the Debtor for the 1750 St. Charles Avenue Homeowners' Association (the "Lift-Stay Motion"). [ECF Doc. 115]. At the hearing on the Lift-Stay Motion, the Trustee stipulated that the purchase agreement with PCR constituted a true sale of the Debtor's accounts receivable related to that particular project. [ECF Doc. 124]. The Court entered an Order granting in part the Lift-Stay Motion and scheduling an evidentiary hearing to hear evidence on issues relating to the allocation of payments. [ECF Doc. 130].

Second, on April 13, 2026, the Trustee filed an objection to PCR's proof of claim (the "Claim Objection"). [ECF Doc. 121].[2] PCR's proof of claim asserts a secured claim in the amount of $13,379,373.51 for "Breach of Contracts/Purchase of Accounts" under its master purchase agreement and purchase addenda with the Debtor. [Claim No. 19-1]. The Claim Objection argues that PCR has no claim against the estate because, to the extent that PCR's master purchase agreement and purchase addenda are valid at all,[3] they constituted true sales without recourse.

Finally, April 24, 2026, and May 13, 2026, the Trustee filed motions to compromise claims ("9019 Motions") against two of the Debtor's customers: Historic St. Peter African Methodist

[2] The Trustee has yet to object to the proofs of claim filed by IAG and IAG 2. [Claim Nos. 17-1 and 18-1].

[3] The Claim Objection asserts that PCR had not proven that the sales were valid because PCR had not yet produced the insurance assignment agreements executed by the Debtor's customers.

Church ("Saint Peter") and Greater Allen Chapel of A.M.E. Church ("Greater Allen"). [ECF Docs. 125 & 132]. The Purchasers filed oppositions to the 9019 Motions, asserting that the Debtor had sold its invoices relating to Saint Peter and Greater Allen to PCR and IAG 2, respectively, under the master purchase agreements and purchase addenda and that the Trustee lacks the authority to settle non-estate claims. [ECF Docs. 134 & 144].

The parties filed the instant motions for summary judgment pursuant to the Court's Scheduling Orders. In sum, the Purchasers' MSJ asks the Court to find that, pursuant to the master purchase agreements and purchase addenda: (1) the Purchasers are the owners of the Debtor's invoices and of any claim arising therefrom, with exclusive authority to pursue collection, (2) the Purchasers are the owners of insurance benefits that were assigned to the Debtor prior to August 1, 2023, (3) the invalidity of any insurance assignment does not affect the Purchasers' other rights under the master purchase agreements, and (4) the Trustee is not entitled to any distribution on account of the purchased invoices until the Purchasers have collected all amounts they are entitled to across all portfolios.

The Trustee's MSJ argues that: (1) all of the insurance assignments executed by the Debtor's customers in favor of the Debtor are null and void, either because of the passage of section 22:1275 of the Louisiana Revised Statutes, effective August 1, 2023, or because of anti-assignment clauses contained within the customers' insurance policies, (2) because the insurance assignments are void, the master purchase agreement between PCR and the Debtor is unenforceable in its entirety, and (3) to the extent the sales of invoices are valid, the estate is entitled to payment of the "refundable reserve" on a per-portfolio basis.

Those issues impact the resolution of each of the Contested Matters. Before ruling on the 9019 Motions and the Claim Objection, the Court must determine whether the Debtor's invoices,

and the claims against the property owners arising thereunder, are property of the estate or are owned by the Purchasers.[4] Additionally, the outstanding issues in the Lift-Stay Motion regarding allocation of any amounts recovered in PCR's litigation against the 1750 Saint Charles Avenue Homeowners' Association depend on interpreting the payment terms under the purchase addenda.

## UNDISPUTED FACTS

The following material facts are either uncontested, not the subject of a genuine dispute, or are subject to judicial notice by this Court:

The Debtor entered into a number of contracts for remediation and repair of properties following Hurricane Ida (each a "Repair Contract"). [ECF Doc. 169-1, ¶ 1 & ECF Doc. 172-1]. In connection with each Repair Contract, the Debtor entered a *Conditional Assignment, Subrogation and Irrevocable Direction To Pay & Grant of Lien on Insurance Proceeds Accessory Agreement* (each a "Subrogation & Assignment Agreement") with each property owner (each a "Customer"). [ECF Doc. 168-1, ¶¶ 15, 34, & 67; ECF Doc. 169-1, ¶ 2]. The Subrogation & Assignment Agreements purported to, among other things, assign post-loss insurance benefits to the Debtor (the "Assignments" and each an "Assignment"). [ECF Doc. 169-2].[5] Each insurance

[4] Counsel for PCR has indicated that PCR only intends to maintain its proof of claim in the event that the Court finds that PCR is not the owner of the invoices. *See* [ECF Doc. 168, at 32–33].

[5] The Sale & Assignment Agreement between the Debtor and Saint Peter provides, in relevant part:

> Property owner hereby (as more specifically addressed below) irrevocably, albeit conditionally, assigns and unconditionally contractually subrogates to Service Provider (collectively, "**Assignment and Subrogation Rights**") any and all of Property Owner's post-loss rights, benefits, title, interests, and proceeds to which Property Owner may be entitled under Property Owner's property and casualty insurance policy (hereinafter "**Policy**") more specifically described above up to the total amount of all monetary obligations owing by Property Owner to the Service Provider under and in connection with the Principal Agreement.

[ECF Doc. 169-2, at 3].

policy that was subject to a Subrogation & Assignment Agreement (each an "Insurance Policy") contained an anti-assignment provision. [ECF Doc. 169-1, ¶ 3; ECF Doc. 172-1].

On August 22, 2022, the Debtor entered into a *First Party Claims Non-Recourse Sale and Assignment Agreement* with IAG (the "IAG Purchase Agreement"). [ECF Doc. 168-1; ECF Doc. 171; ECF Doc. 168-3]. On May 12, 2023, Debtor entered into an identical sale and assignment agreement with PCR (the "PCR Purchase Agreement" and, together with the IAG Purchase Agreement, the "Master Purchase Agreements"). [ECF Docs. 168-10 & 169-5]. The Master Purchase Agreements granted each Purchaser the option to purchase the Debtor's accounts receivable, together with the insurance benefits that the Customers had purportedly assigned to the Debtor.[6]

Pursuant to the Master Purchase Agreements, the Purchasers entered into a number of purchase addenda with the Debtor ("Purchase Addenda" and each a "Purchase Addendum"), with each Purchase Addendum providing for the sale of a specific portfolio of the Debtor's invoices. [ECF Docs. 168-12 & 169-4]. Each Purchase Addendum lists a "Purchase Price," computed as 50% of the "Adjusted Portfolio Receivable," and a "Factor Fee" of 20%. [ECF Docs. 168-12]. The PCR Purchase Agreement was amended on October 2, 2024, to increase the Factor Fee from 20% to 27.5%. [ECF Doc. 168-1, ¶ 62; ECF Docs. 168-11 & 171]. The Purchase Addenda provide

---

[6] Section 2.1 of the Master Purchase Agreements provides:

> Buyer shall have the option, in its sole and absolute discretion, to purchase one or more of the Accounts and Account Balances (together with the applicable AOCs) listed on the Schedule of Accounts attached hereto as **Exhibit B** from Seller (the "**Selected Accounts**" and each a "**Selected Account**"), and Seller agrees to sell all Rights, title and interest in and to the Selected Accounts on the Closing Date. The Selected Accounts, Account Balances and related AOCs, will be sold to Buyer by Seller free and clear of any lien, encumbrance, security interest, or other restrictions of any kind or type.

[ECF Doc. 168-10, § 2.1].

that the Purchasers will collect the Purchase Price and the Factor Fee and remit any "Refundable Reserve" to the Debtor. [ECF Docs. 168-12 & 169-4].

PCR executed Purchase Addenda evidencing the sale of invoices for the following Customers: (a) Bethel African Methodist Episcopal Church, (b) 1750 Saint Charles Condominium Homeowners Association, Inc., (c) Union Bethel African Methodist Episcopal Church, (d) Con El, Inc. & Susca Inc. DBA La Casa Del Sol; Miss Ellies Kitchen, Inc., (e) Saint Peter, and (f) McMillian's First Steps Community Development Center. [ECF Doc. 168-1, ¶ 64; ECF Doc. 171].

IAG and IAG 2 each executed a number of Purchase Addenda pursuant to the IAG Purchase Agreement, including, as is relevant here, to provide for IAG 2's purchase of the Debtor's invoices relating to Greater Allen. [ECF Doc. 168-1, ¶ 30; ECF Doc. 171].

Effective August 1, 2023, section 22:1275 of the Louisiana Revised Statutes prohibits the assignment of post-loss insurance benefits under a residential or commercial property insurance policy. [ECF Doc. 168-1, ¶ 66; ECF Doc. 171]. Both Saint Peter and Greater Allen executed Assignments after August 1, 2023. [ECF Doc. 168-1, ¶¶ 41 & 74; ECF Docs. 169-2 & 169-3].

## DISCUSSION

### A. Summary Judgment Standard

A court grants summary judgment when the pleadings, discovery responses, and affidavits show no genuine dispute as to any material fact and the evidence entitles the movant to judgment as a matter of law. *See* FED. R. CIV. P. 56(a); FED R. BANKR. P. 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). No genuine dispute exists when "a rational trier of fact could not find for the [nonmovant] based upon the record evidence before the court." *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). In deciding a motion for summary judgment, "the judge's function is not

[herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In so doing, the Court views the facts and evidence in the light most favorable to the non-moving party at all times. *See Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). "The interpretation and enforcement of a contract are questions of law, not fact, and so are appropriately dealt with at summary judgment." *Anadarko Petroleum Corp. v. Alt. Env't Solutions, Inc.*, 169 F.4th 542, 548 (5th Cir. 2026) (citations omitted); *see also Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 664 (5th Cir. 2013) ("The interpretation of an unambiguous contract is a legal question that can be properly decided on summary judgment.").

A party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex*, 477 U.S. at 317. Where the moving party also bears the burden of proof at trial, it must "come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (internal quotations omitted). Where the nonmoving party has the burden of proof at trial for a claim or defense, the moving party can show that it is entitled to summary judgment by pointing to the absence of evidence supporting the nonmoving party's case. *See Celotex*, 477 U.S. at 325.

"When parties file cross-motions for summary judgment, [courts] review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Cooley v. Hous. Auth. of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014) (internal quotations and citation omitted).

**B. Any Unenforceable Provisions Regarding the Assignment of Insurance Benefits Are Severable from the Remaining Terms of the Master Purchase Agreements and the Purchase Addenda.**

Section 22:1275 of the Louisiana Revised Statutes provides, in relevant part: "A person shall not solicit or accept an assignment, in whole or in part, of any post-loss insurance benefit under a residential or commercial property insurance policy. An assignment is against public policy and is null and void." LA. REV. STAT. § 22:1275(B)(1). That statute only affects the validity of post-loss insurance assignments dated on or after August 1, 2023. *See Creamer Bros. Inc. v. Gen. Cas. Co. of Wis.*, No. CV 22-6110, 2024 WL 3013664, at *4 (W.D. La. June 14, 2024) (finding that retroactive application of section 22:1275 "would likely violate both the United States Constitution and the Louisiana Constitution as well"). The Trustee takes a broader view, contending that each Assignment purportedly sold to the Purchasers is invalid—regardless of when executed—due to the anti-assignment language in each Insurance Policy. Because the Court finds that the sale and assignment of insurance proceeds under the Master Purchase Agreements is severable from the sale and assignment of the underlying invoices, it is not necessary to determine the extent to which the Purchasers acquired an interest in post-loss benefits under the Insurance Policies.

The standard for determining when an invalid contractual provision is severable is the same whether Texas law or Louisiana law applies.[7] Under Texas law, "[a]n illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential

[7] Although the parties selected Texas law to govern the Master Purchase Agreements, the disputed contract terms involve the attempted assignment of benefits under insurance policies issued in Louisiana. This leads to an apparent choice-of-law issue. Because the Court perceives no material differences between the laws of Texas and Louisiana in regard to contract severability, however, a conflicts analysis is not necessary. *See Schneider Nat. Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) ("If the laws of the states do not conflict, then no choice of law analysis is necessary." (quotation marks and citation omitted)).

purpose of the agreement." *In re Poly-Am., L.P.*, 262 S.W.3d 337, 360 (Tex. 2008) (citations omitted). "Whether or not the invalidity of a particular provision affects the rest of the contract depends upon whether the remaining provisions are independent or mutually dependent promises, which courts determine by looking to the language of the contract itself." *Id.* (citations omitted). "Where each covenant is such an indispensable part of what both parties intended that the contract would not have been made without the covenant, they are mutual conditions and dependent, in the absence of clear indications to the contrary." *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 86 (Tex. App.—Houston 1996), writ denied (Feb. 21, 1997). The Louisiana Legislature has codified essentially the same rule: "Nullity of a provision does not render the whole contract null unless, from the nature of the provision or the intention of the parties, it can be presumed that the contract would not have been made without the null provision." LA. CIV. CODE art. 2034.

Based on the language of the Master Purchase Agreements and Purchase Addenda, the Court finds that the assignments of insurance benefits do not constitute the essential purpose of the contracts. First, each Purchase Agreement contains a severability clause.[8] Under both Texas and Louisiana law, a severability clause is strong evidence that the parties intend to preserve their bargain in the event that one or more provisions of the agreement are found to be invalid. *See,*

---

8 Section 9.8 of the Master Purchase Agreements provides:

> 9.8 Severability. If, but only to the extent that, this Agreement or any provision of this Agreement is declared or found to be unenforceable, voidable or void, for any reason, including but not limited to unconscionability, lack of consideration, or mistake of fact or law, so that either Seller or Buyer would be relieved of all obligations arising under such provision, it is the agreement of Seller and Buyer that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent. If such amendment is not possible, another provision that is legal and enforceable and achieves the same objective shall be substituted therefor. If the remainder of this Agreement is not affected by such declaration or finding and is capable of substantial performance by both Seller and Buyer, then the remainder shall be enforced to the extent permitted by law.

[ECF Doc. 168-10, § 9.8].

*e.g., Hudson v. City of Bossier City*, 2005-0351, p. 20 (La. 4/17/06), 930 So. 2d 881, 894 ("[T]he existence of a severability provision in a contract, while not always regarded as conclusive, will generally be given considerable weight." (internal quotation marks and citation omitted)); *Vince Poscente Int'l, Inc. v. Compass Bank*, 460 S.W.3d 211, 219 (Tex. App.—Dallas 2015) ("Especially where the contract itself expressly contemplates and provides for the severance of an illegal provision, the valid portion of the contract may be enforced.").

Second, the essential purpose of the Master Purchase Agreements and Purchase Addenda is to provide for the sale of the Debtor's receivables at a discount—or, in other words, to factor the Debtor's receivables. The Purchasers provided liquidity for the Debtor by advancing a cash purchase price and receive a premium, in the form of a Factor Fee, for taking on the risk and delay of collection. That purpose can be achieved as long as the Purchasers have the right to collect payment on the invoices, regardless of whether they are entitled to direct payment of post-loss benefits under the Assignments.

The Master Purchase Agreements provide for the "sale, transfer and assignment to [the Purchasers] of all Right, title and interest of [the Debtor] in the Selected Accounts, Account Balances, and the related AOCs . . . ." [ECF Doc. 168-10, § 3.1.18]. Thus, the Master Purchase Agreements contemplate that the Purchasers will acquire *all* of the Debtor's rights to payment under the Repair Contracts, including the Debtor's rights of collection against the Customers.[9] Neither party argues that the invalidity of some or all Assignments extinguishes the Customers'

[9] Indeed, the Debtor specifically represents and warrants in the Master Purchase Agreements that it "has all necessary legal and contractual Rights to pursue collection on all Accounts and against all Customers . . . ." [ECF Doc. 168-10, § 3.1.19].

liability to the Debtor under the Repair Contracts.[10] To the extent that the Purchasers cannot recover from the Insurers directly via the Assignments, they can still obtain the benefit of their bargain by taking collection actions against the Customers. Although the Assignments might provide additional security of payment, the right to payment arises and exists independently under the Repair Contracts and the provisions of the Master Purchase Agreements effecting the sale of "Accounts" and "Account Balances."[11]

Accordingly, the Court finds that any unlawful assignment provisions did not constitute an indispensable part of the bargain between the parties. Those provisions may therefore be severed under Section 9.8 of the Master Purchase Agreements, leaving the remaining provisions of the Master Purchase Agreements and Purchase Addenda enforceable.[12]

### C. Genuine Issues of Material Fact Exist as to Payment of the Refundable Reserve.

The final issue before the Court is whether the estate is entitled to receive the Refundable Reserve on a per-portfolio basis once PCR has collected the Purchase Price and Factor Fee for any one portfolio.

---

[10] *See* [ECF Doc. 169, at 5 ("By the plain letter of the law, the Assignments are null and void. However, the underlying Roof Contracts were not rendered null and void and the Debtor and certain subcontractors performed work for St. Peter and Greater Allen.")].

[11] Texas courts have found that contractual terms that provide additional security of payment are severable from the underlying payment obligation. *See, e.g., Panasonic Co., Div. of Matsushita Electr. Corp. of Am.*, 903 F.2d 1039, 1041–42 (5th Cir. 1990) (holding that a homestead waiver was not an essential feature of the guarantee because it merely provided additional security for the guarantor's obligation to repay the debt); *Vince Poscente Int'l, Inc. v. Compass Bank*, 460 S.W. 211, 218–19 (Tex. App.—Dallas 2015) (same); *Panasonic*, 903 F.2d at 1042 ("An otherwise lawful promissory note is not rendered unenforceable simply because the security given on the note is unenforceable." (citation omitted)).

[12] Additionally, the Court notes that the Trustee asserts PCR knew the Assignments violated anti-assignment clauses in the Insurance Policies, [ECF Doc. 172, at 9], while PCR alleges that it was aware of the enactment of section 22:1275 and knew the Assignments were invalid, [ECF Doc. 168-1, ¶¶ 74–75]. Under either party's theory, PCR chose to enter into the Purchase Addenda despite knowing that the Assignments were unenforceable, which belies the notion that the parties would not have entered into the contracts without the Assignment provisions.

Each Purchase Addendum provides:

> Upon receipt of any cash funds from this Portfolio, or any future Portfolio, that are collected by Buyer or received by Seller or Seller's attorney and delivered to Buyer ("**Payment Collected**"), Buyer shall: (a) deduct and disburse all sums collected from any Payment Collected until the Purchase Price and the Factor Fee of the entire Portfolio are collected in full; and (b) **so long as Seller is in full compliance with the terms and conditions of the Agreement on this and all other Portfolios**, disburse to Seller the remaining balance that is collected from each portfolio (the "**Refundable Reserve**").

[ECF Doc. 168-12, at 1]. PCR argues that, if the Debtor is in breach of the PCR Purchase Agreement or any of PCR's Purchase Addenda, the Refundable Reserve is payable only once PCR has collected the Purchase Price and Factor Fee across all of its portfolios. [ECF Doc. 168, at 12, 31–32]. The Trustee concedes that "the Addenda contemplate that Debtor must be in compliance with all portfolios" to receive the Refundable Reserve but denies that the agreement contemplates pooled collection rights or cross-collateralization. [ECF Doc. 171, at 5–6].

There is no reasonable interpretation of the Purchase Addenda that would entitle the Debtor to payment of the Refundable Reserve on a per-portfolio basis without being in full compliance with the PCR Purchase Agreement; any such interpretation would render the bolded language completely devoid of meaning. The Court finds that genuine issues of material fact exist regarding whether the Debtor breached §§ 3.1.7[13] and 3.1.8[14] of the PCR Purchase Agreement by failing to obtain the required consents to assignment of the insurance benefits, thereby forfeiting its right to a disbursement of the Refundable Reserve on a per-portfolio basis.

---

[13] Section 3.1.7 of the PCR Purchase Agreement warrants that the Debtor "has good and marketable title to each AOC, being sold hereunder and each AOC shall be transferred free and clear of any lien, claim, or encumbrance." [ECF Doc. 168-10, § 3.1.7].

[14] Section 3.1.8 of the PCR Purchase Agreement warrants that the Debtor "has obtained consent and/or approval, to the extent that any consent and/or approval is required, to assign sell and transfer the Accounts the Account Balances and the related AOC's being sold and assigned." [ECF Doc. 168-10, § 3.1.8].

## CONCLUSION

For the reasons set forth above, the Court finds that the Master Purchase Agreements and Purchase Addenda constitute valid and enforceable sales of the Debtor's invoices. Regardless of whether any or all of the contractual provisions purporting to effect a sale and assignment of insurance benefits to the Purchasers are enforceable, those provisions can be severed from the remaining terms of the Master Purchase Agreements.

Accordingly,

**IT IS ORDERED** that PCR's MSJ is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Trustee's MSJ is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the Claim Objection is **SUSTAINED IN PART** and **OVERRULED** in part. PCR must amend its proof of claim within thirty (30) days to conform with this *Memorandum Opinion and Order*.

New Orleans, Louisiana, September 17, 2026.

MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE